**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

**DALTON GARY JR**                                          **CASE NO.  6:24-CV-01626**

**VERSUS**                                                          **JUDGE DEE D. DRELL**

**KILOLO KIJAKAZI**                                  **MAGISTRATE JUDGE DAVID J. AYO**

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the parties' briefs, and the applicable law, and for the reasons set forth below, it is recommended that the Commissioner's decision should be REVERSED and REMANDED for further proceedings.

## Administrative Proceedings

The claimant, Dalton Gary, Jr., fully exhausted his administrative remedies before initiating this action.  Gary filed an application for disability insurance benefits and was subsequently determined to be disabled beginning on February 5, 2019 based on the severe impairments of amputation of his left leg below the knee and dermatitis at the amputation site.  (Rec. Doc. 5-1 at pp. 129–30, 133).  Following a continuing disability review ("CDR"), a Disability Examiner determined that Gary was no longer disabled as of March 8, 2023 based on medical improvement.  (*Id.* at pp. 134–142).   Gary requested reconsideration of the CDR determination.  By notice dated July 11, 2023, Gary was advised that his request for a disability hearing was granted, and a telephone disability hearing, was set for July 19, 2023 at 10:30 a.m.  This notice was mailed to Gary at 1123 Marteau Road, Youngsville, Louisiana, 70592-6114.  (*Id.* at p. 171).

On July 17, 2023, Gary acknowledged the date and time of his upcoming telephone disability hearing, adding the following typewritten claimant statement:

> I have been advised on my right to be sent a notice of the time and place of my disability hearing at least 20 days before the date of my hearing. Also, I have been advised that I should not give up this right, if I need additional time to prepare for the hearing. However, I am prepared to have my hearing on or after July 19, 2023, and hereby knowingly and willingly give up my right to be sent the 20 day advance notice as cited in 20 CFR, sections 404.914(c)(1), and 416.141(c)(1).

(Rec. Doc. 5-1 a pp. 177–79).  Gary listed his address as of July 17, 2023 as 1123 Marteau Road, Youngsville, Louisiana 70592.  (*Id*. at p. 178).

By notice dated July 28, 2023, Gary was informed that his July 19 telephone disability hearing had been postponed and that he would receive separate notice of the new date and time once the hearing was rescheduled.  (*Id*. at p. 181).  A separate notice, also dated July 28, 2023, advised Gary that his telephone disability hearing had been rescheduled for August 9, 2023 at 10:30 a.m.  (*Id*. at pp. 183–84).  These notices were mailed to Gary at his Marteau Road address.  (*Id*. at pp. 180–83).  Gary's instant appeal alleges that he never received these July 28, 2023 notices.  (Rec. Doc. 6 at pp. 1–3).  Gary failed to appear at the August 9, 2023 telephone hearing, as reflected in the August 11, 2023 Disability Hearing Officer's Decision.[1]  (Rec. Doc. 5-1 at pp. 189–195).

By notice, also dated August 11, 2023, Gary was notified of the Disability Hearing Officer's decision affirming the March 8, 2023 finding of medical improvement and attendant cessation of benefits as of that date.  (*Id*. at pp. 189–197).  That notice advised Gary that he could request a hearing within 60 days, and ask for continuation of his benefits while

---

[1]   It is unclear from the record whether Gary was represented by counsel at the time of his August 9, 2023 disability hearing.  The Disability Hearing Officer's Decision does not indicate that counsel appeared on Gary's behalf.  (Rec. Doc. 5-1 at p. 190).

awaiting a hearing, within ten days. (*Id.* at pp. 196–197). This notice was mailed to Gary at his Marteau Road address. (*Id.* at pp. 195–96). On September 11, 2023, Gary submitted a statement offering good cause for his failure to file for continuation of his benefits within ten days (Rec. Doc. 5-1 at pp. 199–200), a form SSA-795 request for continuation of his benefits (*Id.* at pp. 203–04), and a waiver of his right to an in-person hearing before an administrative law judge ("ALJ") (*Id.* at pp. 200–01). These submissions affirm that Gary's address at that time remained 1123 Marteau Road, Youngsville, Louisiana, 70592. (*Id.* at p. 204).

The Office of Hearings Operations sent correspondence dated November 9, 2023 advising Gary of remote hearing options available to him and providing a Remote Hearing Agreement Form which required Gary to indicate whether he agreed to appear either by telephone or by video using Microsoft Teams. (*Id.* at pp. 207–15). This correspondence was mailed to Gary at his Marteau Road address. (*Id.* at p. 207). By correspondence dated November 13, 2023, the Office of Hearings Operations acknowledged Gary's request for a hearing before an ALJ, and advised that he would receive notice "at least 75 days before the date of your hearing[,]" and that this future notice would also advise him of the specific date and time scheduled for his hearing. (*Id.* at p. 218). This correspondence was mailed to Gary at his Marteau Road address. (*Id.* at p. 218).

Gary's claim came before ALJ Devona Able, who published a March 1, 2024 decision affirming the cessation of Gary's benefits as of March 8, 2023 based on medical improvement and an ability to perform sedentary work available in a significant number of jobs in the national economy. (*Id.* at pp. 15–23). Gary was provided notice of the ALJ's unfavorable decision and a copy of that decision by mail at his Marteau Road address. (*Id.* at p. 12).

On April 26, 2024, Gary filed a form SSA-827 Request for Review of Hearing Decision, asserting that he "never received the hearing notice [and] updated records were not

reviewed." (Rec. Doc. 5-1 at pp. 237–42). This filing lists attorney Gabe Duhon as Gary's representative. (*Id.* at p. 237). Notably, the form provides the following address for Gary: 400 N. Herpin Avenue, Kaplan, Louisiana, 70548. (*Id.* at pp. 237–42). Gary sought and was granted additional time by the Appeals Council to supplement the record with additional medical records, which were submitted on or about May 31, 2024. (*Id.* at pp. 36–123). By notice dated September 26, 2024, the Appeals Council notified Gary of its unfavorable decision affirming the ALJ's decision. (*Id.* at pp. 5–11). Accordingly, the ALJ's March 1, 2024 decision became the final decision of the Commissioner in this matter. *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005). This notice advised Gary of his right to appeal via civil action within 60 days, unless an extension based on good cause is granted by the Appeals Council. (*Id.* at pp. 5–7).

Gary filed suit in the Western District of Louisiana on November 27, 2024, alleging that the Commissioner's finding that he is not disabled is unsupported by substantial evidence and applies an erroneous standard of law. (Rec. Doc. 1). A Scheduling Order was issued, directing the filing of briefs and submission of the administrative record. (Rec. Doc. 3). All requested briefs are now filed, along with the administrative record. (Rec. Docs. 5-1, 6, 11, 14). Accordingly, this Court finds this matter ripe for consideration.

### Summary of Pertinent Facts

Gary was born on November 22, 1976. (Rec. Doc. 5-1 at pp. 22). On or about October 26, 2017, he fell from a roof, sustaining a broken left leg. His left leg was fitted with an external fixator, but was amputated on or about February 20, 2018 due to poor limb healing and pain. (*Id.* at p. 388).

Relevant medical records are presented from two main sources: Hanger Clinic in Lafayette, Louisiana ("Hanger") and Southside Family Clinic in Abbeville, Louisiana ("SFC"). These records indicate the following:

- Gary underwent evaluation and casting for his first prosthesis in May of 2018. The prosthesis was delivered to him on May 18, 2018. At that time, Gary was observed to ambulate safely, and without discomfort, sit and stand without issue. Hewas pleased with fit and function of the device. The technician observed no areas of excessive pressure on Gary's residual limb. (*Id.* at pp. 380–93).

- Gary returned to Hanger on June 8, 2018 with complaints of pain following long period of wearing his prosthesis. The technician observed that Gary was wearing inadequate sock ply on that date. (*Id.* at pp. 13–14).

- On July 9, 2018, Gary saw Dr. Dies at SFC with complaints of chest congestion and coughing and a rash on his hands and legs. Gary also asked for STD testing based on the recent diagnosis of his partner. Dr. Dies ordered bloodwork and prescribed Bactroban and Metronidazole. (Id. at pp. 342–44). On this date, Gary's social history included that he smoked, drank alcohol, "currently uses illegal drugs[,]" and has used cocaine. (*Id.* at p. 344).

- On July 17, 2019, Dr. Dies wrote a letter on Gary's behalf, opining that Gary's difficulties in walking comfortably with his prosthesis severely impacted his ability to work. (*Id.* at p. 351).

- On February 5, 2019, Gary saw Dr. Dies at SFC, reporting left leg and knee pain. Gary explained that prolonged use of his prosthetic leads to pain,

5

swelling, and tenderness in his residual limb.  For this reason, he reported that he resorted to using crutches 2–5 days each week.  Gary complained that these circumstances impacted his ability to work.   He reported difficulty pivoting and squatting. (*Id.* at pp. 345–47).  On this date, Gary's social history included that he smoked, drank alcohol, "currently uses illegal drugs[,]" and has used cocaine.  (*Id.* at pp. 346–47).

- On March 8, 2019, Gary saw Dr. Dies at SFC with complaints of a cough, chills, fever, and malaise, which Dr. Dies attributed to suspected influenza. Gary was prescribed Tamiflu and instructed to rest and take fluids.  (*Id.* at pp. 348–49).  On this date, Gary's social history included that he smoked, drank alcohol, "currently uses illegal drugs[,]" and has used cocaine.  (*Id.* at p. 349).

- On October 11, 2019, Gary visited Hanger without an appointment with complaints of a broken footshell.   The technician observed that his prosthesis was irreparably damaged, resulting in poor fit.   Gary was advised to obtain a prescription for a new prosthesis from his doctor so that he could be fitted for a new device.  (*Id.* at 377–78).

- Gary saw Dr. Dies on December 2, 2019, complaining of bone pain in his left leg caused by the wearing of his prosthesis.  He described using foam to cushion the inside of the prosthesis so that his residual limb would not slide down into the device.  Dr. Dies observed excoriation on his residual left limb.  (*Id.* at pp. 397–99).  Dr. Dies referred Gary to Hanger for further treatment.  (*Id.* at p. 398).

- Gary returned on December 9, 2020 with the required referral from Dr. John Dies at SFC. The technician noted that Gary's prosthesis no longer fit well, as evidenced by "callouses on the distal end, fib head and distal patella" showing that "he is falling in too deep within the socket and has been for a while." Gary was counseled on the need to return for adjustments "at least every 6 months." (*Id.* at pp. 368–76). Heunderwent casting and measurement in December of 2019 and his new socket replacement and alignment device were delivered on December 30, 2019. (*Id.* at pp. 97–103). Gary was pleased with the fit and function of the device. Examination of his residual limb following fitting revealed no areas of excessive pressure. (*Id.* at p. 98).

- On April 6, 2021, Gary returned to Hanger, presenting with limb change, cracked equipment, and liners which were unhygienic and torn. It was noted that his residual limb had developed a bursa from the poorly fitting prosthesis. A new prosthesis was recommended. Gary explained that he had spent the preceding year in jail, during which time he received no care for his prosthesis. (*Id.* at pp. 89–96). He subsequently underwent casting and measurement for a new socket replacement and supplies, which were delivered to him on April 26, 2021. (*Id.* at pp. 81–83).

- Gary returned to Hanger on October 12, 2021, presenting with unhygienic and torn liners and poor suspension of the limb inside the prosthesis. A replacement cushion liner and footshell were recommended. (*Id.* at pp. 76–79).

- On March 15, 2022, Gary returned to Hanger, having gained weight, which resulted in "improper fit of the socket."  The improper socket fit, in turn, led to fluid retention in the residual limb.  His foot prosthesis was observed to be delaminating and no longer "in the proper category" because of Gary's weight gain. A new prosthesis was recommended.  (*Id.* at pp. 68–73).

- On March 23, 2022, Gary saw Dr. Dies and reported left leg pain/sciatica triggered by use of his prosthesis.  Dr. Dies observed damage and wear of Gary's prosthesis and recommended a new prosthesis.  (*Id.* at pp. 408–410).

- Gary returned to Hanger and underwent casting and measurement.  He received his new prosthesis on May 24, 2022.  (*Id.* at pp. 59–67).

- On November 29, 2022, Gary returned to Hanger, presenting with a broken one-way valve, holes in his sleeve, a broken footshell, cracks in his carbon fiber foot prosthesis, and thinning of his prosthesis gel liner.  It was determined that his carbon fiber foot was under warranty and could be replaced and that he was in need of new supplies.  On this date, Gary was noted to have "a car detailing business" and reported that he was "in the process of remodeling his house himself."  Additionally, Gary reported that he rode his bike to pick up cans along the roadside to earn extra money.  (*Id.* at p. 56).  Gary took delivery of these supplies on February 9, 2023.  (*Id.* at pp. 51–58).  At the time of this delivery, he was noted to "ambulate without discomfort…sit/stand without problem…[and] ambulate safely."  (*Id.* at p. 52).

- On May 4, 2023, Gary returned to Hanger for another repair to his one-way valve and poor prosthesis fit due to loss of volume in the limb.  The valve

was repaired and a popliteal pad was added. He was satisfied with these adjustments. (*Id.* at pp. 49–50).

- On October 5, 2023, Gary saw Dr. Dies with complaints of sinus congestion, fatigue, body aches and chills. Dr. Dies prescribed Flonase and Sudafed. (Rec. Doc. 7 at pp. 8–10). On this date, Gary's social history included that he smoked, drank alcohol, "currently uses illegal drugs[,]" and has used cocaine. (*Id.* at p. 10).

- Gary saw Dr. Dies on November 7, 2023 with complaints of mood disturbances and trouble focusing. Dr. Dies noted that Gary had been "sobering up." (Rec. Doc. 7 at p. 4). Dr. Dies recommended replacement of Gary's prosthesis based on weight fluctuation and the condition of his prosthesis at the time of the office visit. (*Id.*). Gary was prescribed Seroquel and referred to Hanger for "repair and/or replace of prosthesis." (*Id.* at p. 5). On this date, Gary's social history included that he smoked, drank alcohol, "currently uses illegal drugs[,]" and has used cocaine. (*Id.* at p. 6).

- Gary was seen at Hanger on November 9, 2023 to be evaluated for a new prosthesis. He presented with a cracked socket, as well as wounds and callousing on his residual limb. A new socket and foot prosthesis were recommended. (*Id.* at pp. 43–48). He underwent casting and measurement and took delivery of his new prosthesis on January 19, 2024. (*Id.* at pp. 36–42). On that date, Gary was noted to be "so happy with his leg today" and "pleased with fit and function of the device." No areas of excessive pressure were found and Gary reported no pain while wearing the device. (*Id.* at pp. 37–38).

- On November 21, 2023, Gary returned to Dr. Dies, reporting improvement in his generalized anxiety.  He reported some fatigue after taking Seroquel, but also reported that this side effect was improving.  Dr. Dies renewed Gary's Seroquel prescription. (Rec. Doc. 7 at pp. 1–3).  On this date, Gary's social history included that he smoked, drank alcohol, "currently uses illegal drugs[,]" and has used cocaine.  (*Id.* at p. 2).

Gary filed for disability benefits on July 15, 2019, alleging the inability to work as of October 26, 2017, which this Court presumes is the date of the traumatic injury to his left leg.  (Rec. Doc. 5-1 at p. 125).  In January 2020, the Commissioner determined that Gary was disabled based on the severe impairments of left leg amputation and dermatitis, finding an established disability onset date of December 18, 2019.  (*Id.* at p. 131).  Gary's disability onset date was later updated to February 5, 2019.  (*Id.* at p. 133).

After review of Gary's periodic continuing disability reports, a disability hearing officer determined that he was no longer disabled as of March 8, 2023 and issued a Notice of Disability Cessation accordingly.  (*Id.* at pp. 159–161).  Specifically, the hearing officer found that

> [t]he medical evidence shows that you have adjusted well to ambulating with a prosthesis.  While you should not perform work requiring heavy exertional activities, your overall condition allows you to perform work requiring less physical effort…We do not have sufficient vocational information to determine whether you can perform any of your past relevant work.   However, based on the evidence in file, we have determined that you can adjust to other work.

(*Id.* at p. 161).

Gary requested reconsideration, which was eventually set for August 9, 2023.  As explained further herein, Gary failed to appear for this telephone hearing and, upon notice

of the resulting adverse decision, sought a hearing before an ALJ. (*See*, *Id.* at pp. 164–65, 177, 196–97, 218–21). Gary waived his right to appear at his ALJ hearing, resulting in the ALJ's decision on the record without hearing pursuant to 20 C.F.R. 404.948(b). (*Id.* at p. 15).

The ALJ's decision makes the following findings:

1. The comparison point decision ("CPD") is a finding of disability dated January 7, 2020. (Rec. Doc. 5-1 at p. 17).

2. At the time of the CPD, Gary suffered from the medically determinable impairments of amputation of the left leg below the knee, and dermatitis, which were found to meet Section 1.05B of 20 C.F.R. 404.1520(d). (*Id.* at p. 17).

3. Gary did not engage in substantial gainful activity through the date of the decision. (*Id.* at p. 17).

4. Gary did not develop additional medical impairments from the date of the CPD through the date of the decision. (*Id.* at p. 17).

5. Since March 8, 2023, Gary did not have an impairment or combination of impairments that met or medically equaled the listing in 20 C.F.R. 404.1525 and 1526. (*Id.* at p. 17).

6. Medical improvement occurred on March 8, 2023. (*Id.* at p. 18).

7. The medical improvement is related to Gary's ability to work, since no later than March 8, 2023, he no longer had an impairment or combination of impairments that met or medically equaled the listings under which he was found to be disabled in the CPD. (*Id.* at p. 18).

8. Since March 8, 2023, Gary's impairment has been severe. (*Id.* at p. 18).

9. Since March 8, 2023, Gary has maintained residual functional capacity to perform sedentary work with the limitations that he can frequently balance and stoop; can

occasionally climb ramps and stairs, kneel, and crouch; can never crawl or climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to hazards. (*Id.* at pp. 18–19).

10. Gary's past relevant work is "expedited" pursuant to 20 C.F.R. 404.1520(h). (*Id.* at p. 21).

11. Gary is classified as a claimant of younger age pursuant to 20 C.F.R. 404.1563. (*Id.* at p. 22).

12. Gary has a limited education pursuant to 20 C.F.R. 404.1564. (*Id.* at p. 22).

13. Transferability of job skills is not relevant because Gary is not disabled based solely on age, education, and residual functional capacity. (*Id.* at p. 22).

14. Since reaching medical improvement on March 8, 2023, Gary has been able to perform a significant number of jobs in the national economy. (*Id.* at p. 22).

15. Gary's disability ended on March 8, 2023 and he has not become disabled again since that date. (*Id.* at p. 23).

Gary now seeks reversal of the Commissioner's adverse ruling, alleging that: 1) he did not receive notice of the August 9, 2023 hearing, making the hearing officer's finding that he failed to appear and cooperate improper; 2) the March 8, 2023 medical improvement finding was based on Gary's receipt of new prosthetic limb, rather than substantive medical improvement, and was not based on all available medical records; and 3) the ALJ's residual functional capacity finding fails to cite relevant medical basis or findings as to Gary's ability to sit, stand, or lift. (Rec. Doc. 6 at pp. 2–3).

<u>Analysis</u>

A.      <u>**Standard of Review**</u>

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper

12

legal standards were used in evaluating the evidence. *Whitehead v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016). "Substantial evidence is merely enough that a reasonable mind could arrive at the same decision; though the evidence 'must be more than a scintilla[,] it need not be a preponderance.'" *Webster v. Kijakazi*, 19 F.4th 715, 718 (5th Cir. 2021) (quoting *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012)). Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1137 (5th Cir. 1973); *Payne v. Weinberger*, 480 F.2d 1006 (5th Cir. 1973)).

"If the Commissioner's findings are supported by substantial evidence, they are conclusive" and must be affirmed. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005) (citing *Richardson v. Perales*, 402 U.S. 389, 390 (1971)). In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner. *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995) (citing *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985)). Four elements of proof are weighed by the court in determining whether substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education, and work experience. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991). Conflicts in the evidence should be resolved, not by the court, but by the Commissioner. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

**B.      Entitlement to Benefits and Burden of Proof**

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[2]   42 U.S.C. § 423(a).   The Social Security Act ("Act"), 42 U.S.C. § 301, *et seq.*, defines disability as an

> inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 423(d)(1)(A).   A claimant must demonstrate not only a disability, but also that such disability renders him unable to engage in "substantial gainful activity."   *Milam v. Bowen*, 782 F.2d 1284 (5th Cir. 1986).   Inability to engage in "substantial gainful activity" means that a claimant is

> not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

20 C.F.R. § 423(d)(2)(A).

In cases where a claimant is found to be disabled, the Commissioner must review the claimant's impairment at least once every three years to determine whether the disability persists.   42 U.S.C. § 421(i)(1).   This continuing disability review process ("CDR") seeks to discern whether a claimant has experienced "medical improvement," which is "any decrease in the medical severity of [his] impairment[s] which [were] present at the time of the most

---

[2]      *See* 42 U.S.C. § 423(a).   *See also Smith v. Berryhill*, 139 S. Ct. 1765, 1772 (2019).

14

recent favorable medical decision" that the claimant was disabled or that his disability persisted without medical improvement. 20 C.F.R. § 404.1594(b)(1).

As part of the CDR process, the claimant must provide the Commissioner with reports from treating physicians, as well as any other evidence that may assist in determining whether he has experienced medical improvement. 20 C.F.R. § 404.1593(b). The Commissioner compiles a medical history spanning the period between the last favorable determination and the claimant's most recent disability report. If that medical history shows medical improvement, the claimant is no longer eligible to receive benefits. 42 U.S.C. § 423(f).

When determining whether the claimant continues to suffer from a disability under the Act, or if there has been medical improvement requiring the cessation of benefits, the Commissioner applies an eight-step sequential evaluation process. 20 C.F.R. § 404.1594(f). The Commissioner must determine:

(1) Whether the claimant is currently engaged in substantial gainful activity;

(2) If not, whether the claimant has an impairment or combination of impairments that meets or medically equals the severity of an impairment enumerated in the relevant regulations;

(3) If not, whether there has been medical improvement;

(4) If so, whether the medical improvement is related to the claimant's ability to work; or

(5) If there has been no medical improvement or such medical improvement is unrelated to the claimant's ability to work, or if one of the first group of exceptions applies, whether the claimant's current impairment or impairments is severe; and

(6) If so, whether the claimant, based on his assessed residual functional capacity ("RFC"), is able to engage in past relevant work; and

15

(7) If not, whether the claimant is able to perform other substantial gainful activity

in light of his RFC, age, education, and past work experience.

20 C.F.R. § 404.1594(f); *Griego v. Sullivan*, 940 F.2d 942, 944 (5th Cir. 1991). In disability termination proceedings, the Commissioner bears the burden of proof and "must, in all relevant respects, prove that the person is no longer disabled." *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002) (citing *Griego*, *supra*, at 943–44).

**C.   Assignments of Error**

   1.   <u>Notice of the August 9, 2023 disability hearing</u>

   As detailed above, a telephone disability hearing was originally set for July 19, 2023. (Rec. Doc. 5-1 at p. 171). Notice of this hearing was sent to Gary at his Marteau Road address, dated July 11, 2023. (*Id.*). Gary acknowledged the July 19, 2023 hearing notice, specifically indicating that he planned to appear by phone at 10:30 a.m. on the appointed date. (*Id.* at p. 177). On the same date, he submitted a typewritten claimant statement waving his right to twenty days' advance notice of his disability hearing under 20 C.F.R. 404.914. (*Id.* at p. 177–78). Thereafter, his disability hearing was rescheduled from July 19th to August 9th. Two notices advising of the change to his hearing date, dated July 28, 2023, were mailed to Gary at his Marteau Road address. (*Id.* at pp. 180–85). The record contains no indication that Gary received these notices, nor any indication that Gary completed the included hearing acknowledgement form as to the August 9 disability hearing, as he had done previously for the July 19 disability hearing date. It is unclear from the record whether Gary was represented by counsel during this time.

   The record reflects that Gary failed to appear by telephone for the August 9, 2023 disability hearing and, for this reason, the hearing officer applied the failure-to-cooperate exception. (*Id.* at p. 193). He asserts that he did not receive either of the July 28, 2023 notices

16

advising that his telephone disability hearing was rescheduled for August 9, 2023. (Rec. Doc. 6 at p. 3). Gary's request for interim continuation of benefits pending further proceedings affirms that, as of September 11, 2023, he continued to reside at the Marteau Road address. (Rec. Doc. 5-1 at pp. 203–04).

Thus, this Court gleans from the record that the Commissioner failed to provide adequate notice of the July 19, 2023 disability hearing under 20 C.F.R. 404.914(c)(1). Nevertheless, Gary's acknowledgement dated July 17, 2023 affirms that he did actually receive notice of the July 19 disability hearing and was prepared to appear via telephone at the appointed date and time. (*Id.* at p. 177). The record also shows that notices of the new disability hearing date (August 9, 2023) were sent to Gary at the correct mailing address on July 28, 2023. Like the July 11, 2023 notice, the Commissioner's July 28, 2023 notices fail to provide at least twenty days' notice prior to a disability hearing. However, Gary's intervening waiver of his right to notice under 20 C.F.R. 404.914(c)(1) renders these notices adequate in this case. The record indicates that Gary experienced prior difficulty in receiving correspondence related to this claim. He was notified of the cessation of his benefits based on the initial medical improvement finding dated March 8, 2023 and mailed to him at "P.O. Box 9926, New Iberia, LA 70562-8926[.]" (*Id.* at pp. 158–61). Gary failed to appeal this determination within the ten days necessary to request interim continuation of benefits, but later filed a statement essentially alleging that he did not receive notice of the cessation of his benefits, which he suspected may have resulted from his recent change in address, of which he claims he had previously advised the Commissioner. (*Id.* at p. 165). The Commissioner found good cause for Gary's delay in seeking continuation of benefits, curing any prejudice to this claimant that may have resulted from his mail not being delivered to him. (*Id.* at p. 169).

Procedural due process requires that social security claimants receive notice of "material factors" that may impact decisions regarding benefits. *Francisco v. Barnhart*, 366 F. Supp. 2d 461, 466 (S.D. Tex. 2004) (citing *Harris v. Callahan*, 11 F. Supp. 2d 880, 883 (E.D. Tex. 1998). "Adequate notice is that which is 'reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Bliek v. Palmer*, 102 F.3d 1472, 1475 (8th Cir. 1997) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). Waivers of claimant rights before the Social Security Administration must be made intelligently, with knowledge of such rights and the potential consequences of the contemplated waiver. *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981) (considering waiver of right to appear pursuant to Social Security Ruling 79-19).

Gary raised the issue of his lack of disability hearing notice in his claimant statements filed prior to the ALJ hearing, and thus part of the record before the ALJ at the time of her decision. (*See*, *e.g.*, Rec. Doc. 5-1 at p. 202). The ALJ noted Gary's failure to appear at the August 9, 2023 disability hearing, but did not address Gary's contention that he was not provided notice of same, nor did she address the resulting application of the exception for failure to cooperate. (*Id.* at p. 15).

Gary's waiver, even if knowing and intelligent, waived only his right to at least twenty days' notice prior to his disability hearing. This Court does not construe the claimant's waiver to be a waiver of all notice, such that it effectively constitutes a waiver of appearance. The requirements of an appearance waiver, contained within SSR 79-19 are unfulfilled by Gary's typewritten claimant statement.[3] (*Id.* at p. 179).

---

[3] SSR 79-19 requires that a claimant or his authorized representative may "waive the right to personal appearance at a hearing only by a writing by the individual or authorized representative which shows:

18

The first indication that Gary was represented by counsel came with the submission of his Request for Review of Hearing Decision/Order signed on April 26, 2024 and received by the Office of Appellate Operations on or about May 2, 2024. (*Id.* at pp. 235–36). In conjunction with Gary's appeal, his attorney also submitted additional medical record evidence on or about May 31, 2024. (Rec. Doc. 5-1 at pp. 36–123). Thus, the record appears to show that Gary was prosecuting his claim *pro se* until he appealed the ALJ's March 1, 2024 decision. An ALJ's duty to develop the record is "expanded" where the claimant acts *pro se*. *Francisco v. Barnhart*, 2003 WL 548870 at *2 (S.D.N.Y. 2003) (internal citations omitted). The ALJ's neglect of the notice issue in this case fails to fulfill this duty.

To the extent that Gary must show prejudice resulting from the failure to appear based on lack of notice, the undersigned finds that prejudice has been fairly alleged. The disability hearing officer notes that an exception for failure to cooperate was applied to Gary's disability finding. Neither the disability hearing officer, nor the ALJ address the impact of this exception. The government's brief does not reach this issue. Accordingly, this Court will recommend remand based on this error.

---

1.  a thorough explanation of the hearing procedure has been given;

2.  the right to personal appearance at the hearing and to testify and present evidence has been explained;

3.  an explanation has been given of the right to representation at the hearing by an attorney or other person of the individual's choice;

4.  it has been explained that, in some cases, additional evidence obtained through oral testimony and personal presence before the presiding officer may be of value in evaluating the issues;

5.  the individual has been advised that, if he or she does not appear, the claim will be decided solely on the written evidence then in file plus any additional evidence submitted by the individual or the representative or obtained by the hearing officer; and

6.  the individual has been advised that he or she may withdraw the waiver of the right to appear at the hearing at any time prior to the mailing of notice of the decision.

19

2.      Medical improvement finding

Gary next alleges that the ALJ's finding of medical improvement as of March 8, 2023 was in error, as it contemplated an incomplete medical record and was based on receipt of a new prosthesis, rather than improvement of his impairments.  Specifically, Gary asserts that while he has been fitted with a new prosthetic limb, he "remains without a left leg below the knee."  (Rec. Doc. 6 at p. 2).  As noted by the ALJ, Gary waived his right to appear at the hearing, which rendered the ALJ's consideration of the claim as one conducted solely on the record pursuant to 20 C.F.R. 404.948.  (Rec. Doc. 5-1 at pp. 15, 200).  Additional records submitted by Gary to the Appeals Council in support of his appeal are dated between May 4, 2023 and January 19, 2024, and are also filed as attachments to Gary's brief.  (Rec. Doc. 7).  Gary argues that these documents demonstrate that he has not experienced medical improvement of his severe impairments, as he remains an amputee.  (Rec. Doc. 6 at p. 2).

Gary's argument oversimplifies the relevant analysis where the impairment of amputation of a limb is concerned.  As noted by the ALJ, the CPD initial disability determination considered the impairment of amputation of a single lower extremity under former listing 1.05B.  This impairment listing was updated and is now contained in listing 1.20D, addressing amputation due to any cause.  20 C.F.R. 404, Subpart P, Appendix 1.  The ALJ observed that prior listing 1.05B required "an inability to use a prosthetic device to ambulate effectively [lasting] or expected to last for at least 12 months."  (Rec. Doc. 5-1 at p. 17).  Based on these criteria, the ALJ determined that the medical record evidence did not support a finding that Gary was then experiencing difficulty using a prosthetic device, citing Gary's March 23, 2022 visit to Dr. John Dies, at which Dr. Dies observed that Gary "has continued to show positive outcomes with mobility and improved daily life as a result of his prosthesis" and that reported "intermittent discomfort at site between prosthesis and limb" could be resolved with "updated equipment."  (*Id.* at p. 408).  The ALJ also cited February 9,

20

2023 notes from Hanger Clinic, at which he "was seen…for delivery of…supplies[,]" which included replacement of his MetaArc, rusted alignable componentry, as well as tightening and adjustment of screws to manufacturer's specifications. At that visit, Gary was noted to "ambulate[] well without discomfort[,]" with "comfortable and supportive" socket fit and good prosthesis suspension. (*Id.* at pp. 417–19).

> Turning to current listing 1.20D, the ALJ noted that this listing similarly requires

> [a]mputation of one or both lower extremities, occurring at or above the ankle…, with complications of the residual limb…that have lasted, or are expected to last, for a continuous period of at least 12 months, and medical documentation of…[t]he inability to use a prosthesis; and a documented medical need for a walker, bilateral canes, or bilateral crutches…or a wheeled and seated mobility device involving the use of both hand.

(*Id.* at pp. 17–18).

Applying the criteria of current listing 1.20D, the ALJ found that the record did not support a finding of disability based on Gary's improved use of a prosthesis, lack of continued residual limb complications, and the absence of a need for a walker, crutches, or mobility device. (Rec. Doc. 5-1 at pp. 17–18).

At the time of the January 2020 CPD, the Commissioner determined that Gary met listing 1.05B based on loss of his ability to ambulate with his prosthesis, stump pain, skin irritation, and development of calluses. As a result, Gary was using crutches at least three days a week. (*Id.* at p. 128). As noted by one of the medical consultants who participated in the disability determination, Gary was fitted with a new prosthesis shortly before the date of the report. This medical consultant suggested reviewing Gary's case one year from the date this new prosthesis is functional, indicating the potential for improvement in Gary's ability to ambulate independently with better prosthetic equipment. (*Id.* at p. 128).

Whether under former listing 1.05B, or current listing 1.20D, the record supports the ALJ's conclusion that Gary's impairment of amputation no longer met the disability listing,

21

as required for a finding of disability, as of March 8, 2023. This is true because these listings require not only the amputation of a lower extremity, but complications with the residual limb at a minimum, which were no longer demonstrated in the medical evidence as of that date. Based on the foregoing, the undersigned finds no error in the ALJ's finding of medical improvement as to Gary's impairment of left leg amputation under former listing 1.05B or current listing 1.20D.

3.      Residual functional capacity finding

The ALJ found that Gary has had the residual functional capacity to perform sedentary work subject to the limitations that he can frequently balance and stoop; can occasionally climb ramps and stairs, kneel, and crouch; can never crawl or climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to hazards. (*Id.* at pp. 18–19). In reaching this determination, the ALJ found the consultative medical opinions of Dr. Sheryl S. Smith and Dr. Charles Knight "generally persuasive." (*Id.* at p. 21).

20 C.F.R. § 404.1567(a) provides that

> [s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

As acknowledged by the ALJ, this case features a limited medical record, offering records from Dr. Dies, Gary's general practitioner, and the Hanger clinic. These records do not offer insight into Gary's ability to fulfill sedentary work criteria. Accordingly, the failure of the ALJ to develop the record concerning Gary's ability to stand, walk, and lift was error, particularly in light of the increased burden as to this claimant who it appears was acting *pro se* at the time of the hearing.

22

Similarly, the record contains many references to illegal drug use and a period of incarceration.  (*See*, *e.g.*, Rec. Doc. 5-1 at p. 346–47).  The ALJ's disregard of this issue is unreasonable given its clear indication in the medical records.  Although the undersigned offers no prediction of the ultimate materiality of any drug use disorder on the cessation of the claimant's benefits, this issue should be addressed as part of a fully developed record.  42 U.S.C. § 423(d)(2)(C).  Accordingly, this Court will recommend remand with instructions for development of the record, to include consideration of Gary's ability to fulfill the requirement of sedentary work and the materiality of Gary's use of illegal drugs.

## Conclusion and Recommendation

For the reasons fully discussed above, this Court recommends that the Commissioner's decision should be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions for additional proceedings, to include development of the record concerning Claimant Dalton Gary, Jr.'s ability to fulfill the criteria of sedentary work and his history of illegal drug use and incarceration.  Additionally, Gary should be granted a new hearing and permitted to revoke his prior waiver of personal appearance, if desired.  Because the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act ("EAJA").[4]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may

[4]     *See Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992); *Shalala v. Schaefer*, 509 U.S. 292 (1993).

respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.

Signed in Lafayette, Louisiana, this 10th day of March, 2026.


David J. Ayo
United States Magistrate Judge

24